# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-KA-00691-COA

**MITCHELL ROY HERRINGTON A/K/A**        **APPELLANT**
**MITCHELL HERRINGTON A/K/A MITCHELL**
**R. HERRINGTON**

v.

**STATE OF MISSISSIPPI**        **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 05/20/2022 |
| TRIAL JUDGE: | HON. DALE HARKEY |
| COURT FROM WHICH APPEALED: | JACKSON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: DANIEL HINCHCLIFF |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY:  SCOTT STUART |
| DISTRICT ATTORNEY: | ANGEL MYERS McILRATH |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 07/16/2024 |
| MOTION FOR REHEARING FILED: | |

**BEFORE CARLTON, P.J., McDONALD AND McCARTY, JJ.**

**McDONALD, J., FOR THE COURT:**

¶1.     Mitchell Roy Herrington appeals his Jackson County Circuit Court jury conviction for aggravated assault under Mississippi Code Annotated section 97-3-7(2) (Supp. 2016).[1] Herrington was sentenced as a nonviolent habitual offender under Mississippi Code

---

[1]  Section 97-3-7(2)(a) states: "A person is guilty of aggravated assault if he . . . attempts to cause or purposely or knowingly causes bodily injury to another with a deadly weapon or other means likely to produce death or serious bodily harm[.]"

Annotated section 99-19-81 (Rev. 2015)[2] to serve twenty years as a nonviolent habitual

offender in the custody of the Mississippi Department of Corrections. Herrington's appellate

counsel filed a brief under the holding of *Lindsey v. State*, 939 So. 2d 743 (Miss. 2005), and

requested additional time for Herrington to file a pro se supplemental brief. Herrington then

requested additional time to file his brief, which our Court granted; however, Herrington

never filed his pro se supplemental brief. Accordingly, we conduct our independent review

under *Lindsey*.

## FACTS AND PROCEDURAL HISTORY

¶2.     Herrington was in a relationship with Katherine Denning for roughly ten years, and

they lived together in Katherine's apartment. However, Katherine felt the two had grown

apart. On May 30, 2018, Herrington had gone to the liquor store and began drinking around

10:00 in the morning. Katherine later went into the bedroom where Herrington was lying on

the bed and told him he needed to move out. Katherine then went into the living room and

---

[2] Section 99-19-81 states:

> Every person convicted in this state of a felony who shall have been convicted twice previously of any felony or federal crime upon charges separately brought and arising out of separate incidents at different times and who shall have been sentenced to separate terms of one (1) year or more in any state and/or federal penal institution, whether in this state or elsewhere, shall be sentenced to the maximum term of imprisonment prescribed for such felony unless the court provides an explanation in its sentencing order setting forth the cause for deviating from the maximum sentence, and such sentence shall not be reduced or suspended nor shall such person be eligible for parole or probation.

sat on the couch to watch TV. Herrington then came out of the bedroom with a machete and cut Katherine several times. According to Katherine, Herrington eventually stopped, and she was able to crawl out of the apartment. Katherine, severely injured, then tried to get help by knocking on the door of the neighboring apartment, but no one answered. Katherine then crawled back into her apartment to find her phone. There, Katherine saw Herrington, who was on the phone with his sister. Katherine said Herrington did not appear impaired, he was not slurring, and "[h]e knew what was going on." Shortly after, the police and an ambulance arrived. Katherine underwent surgery to treat wounds to her fingers, which were cut to the bone, and her face. Herrington was arrested and charged with aggravated assault.

¶3. At trial, the State called Robert Denton with the Jackson County Sheriff's Department as a witness. He testified that Herrington was standing in the apartment near Katherine when he (Denton) arrived at the scene. A bloody machete was on the floor next to Katherine, and Herrington had blood on his hands. The State also called Jessica Seals, the case investigator, who stated that when she arrived at the scene, Katherine told her that Herrington "beat me or cut me with a machete." Officers recovered the machete and another knife from under the bed in the bedroom. After the State rested, Herrington made a motion for a directed verdict, which was denied.

¶4. Herrington called his sister, Norma Franks, who testified that Herrington was born with birth defects and that he suffered from PTSD from events in his childhood. Norma said that these events caused Herrington to have nightmares where he would appear to be awake

3

and aware of his surroundings, but later he would have no memory.

¶5.     Herrington also testified in his own defense.  He said that as a child, he witnessed his stepfather attack his mother with a knife, and his mother shot his stepfather five times. Herrington also said that he was in a serious automobile accident when he was eighteen, resulting in a traumatic brain injury.  He said that these events caused him to experience "serious" PTSD, leading to alcoholism, anxiety, and depression.  He testified that he was asleep at the time of this assault and vividly recalled a dream where "[Putin, Trump, and] the President of North Korea" were talking.  Herrington said:

> They had a big courtyard out there and I could see soldiers running around out there and soldiers running through the hallway, soldiers running out through the parking lot.  And it was in my mind at that time we were being invaded by the North Koreans . . . after that happened . . . then I got scared.

While allegedly in this dream state, Herrington said he grabbed the machete from under the bed and went into the living room, where he saw "soldiers" on the couch with guns.  He attacked the "soldiers" and then heard Katherine ask him what he was doing.  Only at this point did Herrington realize he had been dreaming (according to him).  After he came out of this alleged dream state, Herrington called his sister, and she called the police.

¶6.     The defense called Dr. Mike Darin as an expert witness, who testified that Herrington underwent a sleep study which determined that he suffered from extremely disrupted sleep. Dr. Darin said that this may lead to sleep terrors that can provoke aggression.  Dr. Darin testified about a similar case he studied where a father thought that soldiers were attacking his house, and in response the father killed his daughter and wife with an axe.  Dr. Darin

4

explained that such incidents are rare and that they are not often reported. He said that people in such a state may be able to take in information but not understand it. Dr. Darin said that, in his opinion, there was no doubt that Herrington suffered from sleep terrors.

¶7. On rebuttal, the State called Dr. Ryan Darby. Dr. Darby was qualified as an expert in "behavioral neurology" with expertise in neurological disorders and criminal behavior, including sleep disorders. Dr. Darby testified that a sleepwalker committing a violent crime is a rare occurrence and that Herrington's behavior was not indicative of him being under the effects of a sleep terror at the time of the assault. Dr. Darby explained that patients with sleep terrors often attack in a senseless manner as compared with Herrington's actions, and that "there were reasons . . . that would have led up to and created a motivation or a reason [for] the crime . . . ." Dr. Darby pointed out that the action of taking the machete out from under the bed and then walking to the living room and attacking Katherine were more indicative of Herrington being conscious and awake at the time of the assault rather than suffering from a sleep terror. Further, Dr. Darby said that a person suffering from sleepwalking and sleep terrors would need to be asleep for a significant period of time to go into an episode, but in this case Herrington came out of the bedroom rather soon after Katherine spoke with him about him needing to move out.

¶8. Dr. Darby also criticized Dr. Darin's methodology, pointing out his failure to interview Katherine as a "bed partner" was a significant shortcoming. Dr. Darby explained that Katherine could have given important history regarding past instances of sleep terrors

5

or sleepwalking. Thus, Dr. Darby opined that Herrington was not suffering from sleep terrors at the time of the assault.

¶9.     Following this testimony, the jury deliberated and returned a verdict of guilty. Following the verdict, Herrington's trial counsel filed a motion for judgment notwithstanding the verdict or a new trial, which the trial court denied. Herrington appealed and was assigned indigent appellate counsel with the State Public Defender's Office. On appeal, the indigent appellate counsel stated in his brief that after diligently searching the procedural and factual history of this criminal action and scouring the record, he was unable to find any arguable issues for appellate review. As such, he submitted his brief pursuant to *Lindsey*, requesting that Herrington be given additional time to file a pro se supplemental brief. Herrington then filed a motion requesting additional time to file his supplemental brief, which our Court granted. However, Herrington never actually filed any supplemental brief with our Court.

## DISCUSSION

¶10.    *Lindsey* establishes the "procedure to govern cases where appellate counsel represents an indigent criminal defendant and does not believe his or her client's case presents any arguable issues on appeal[.]" *Lindsey*, 939 So. 2d at 748 (¶18). Pursuant to *Lindsey*, this Court has "reviewed the briefs and conducted an independent and thorough review of the record, and we conclude that there are no issues that warrant reversal." *Green v. State*, 242 So. 3d 923, 925 (¶9) (Miss. Ct. App. 2018) (quoting *Taylor v. State*, 162 So. 3d 780, 787 (¶18) (Miss. 2015)).

6

¶11. We reach this conclusion with a clear understanding that the jury determines factual issues in dispute and judges the credibility of witnesses and that sufficient evidence supported Herrington's conviction. *Knox v. State*, 912 So. 2d 1004, 1009 (¶23) (Miss. Ct. App. 2005) (citing *Harvey v. State*, 875 So. 2d 1133, 1136 (¶18) (Miss. Ct. App. 2004)); *see also Fonville v. Zeid*, 327 So. 3d 658, 670 (¶36) (Miss. Ct. App. 2021) (reiterating that "it is well-settled law that when conflicting expert testimony is presented, the winner in a battle of the experts is to be decided by a jury") (internal quotation marks omitted)). "A trial court's disposition of a matter is presumed correct unless and until a proper party brings a successful appeal," and we have no arguable issues of error to review. *Gill v. State*, 962 So. 2d 552, 555 (¶15) (Miss. 2007) (citing *Robinson v. State*, 345 So. 2d 1044, 1045 (Miss. 1977)); *see also Woodson v. State*, 292 So. 3d 221, 223 (¶10) (Miss. 2020). As such, we affirm Herrington's conviction and sentence.

¶12. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., WESTBROOKS, McCARTY, SMITH AND EMFINGER, JJ., CONCUR. LAWRENCE, J., NOT PARTICIPATING.**